**LNC INVESTMENTS, INC., Plaintiff,**

v.

**REPUBLIC OF NICARAGUA, Defendant.**

**No. 96 Civ. 6360(JFK).**

United States District Court, S.D. New York.

April 26, 2000.

---

Pavelic & Levites P.C., New York, NY, David R. Gilliatt, Radovan I. Pavelic, for the Plaintiff, of counsel.

Cleary, Gottlieb, Steen & Hamilton, New York, NY, George Weisz, for Interested Third Party the Banco Central de Nicaragua, of counsel.

## OPINION and ORDER

KEENAN, District Judge.

Before the Court is the motion of the Banco Central de Nicaragua ("the Central Bank"), an interested third party, to vacate and quash the Restraining Notice and Information Subpoena served upon the Federal Reserve Bank of New York by the Plaintiff and judgment creditor LNC Investment, Inc. ("LNC"), pursuant to Rule 69 of the Federal Rules of Civil Procedure and section 5240 of the New York Civil Practice Law. For the reasons discussed below, the motion of the Central Bank is granted.

### Background

The Republic of Nicaragua entered into a loan agreement dated December 11, 1980 (the "1980 Loan Agreement") which set forth terms pursuant to which Nicaragua restructured prior loans of both itself and over 60 of its governmental agencies, including the Central Bank, and was obligated to repay certain funds (hereinafter referred to as "Category I Debt").[1] See Joint 56.1 Stmt. ¶ 3. Nicaragua became the named obligor under the 1980 Loan Agreement, substituting itself for the borrowers under the old loans and promising to pay in full all the canceled obligations. See Gilliatt Aff., Ex. A, 1980 Loan Agreement, at 1, 28. Nicaragua did not make all the loan payments it owed under the 1980 Loan Agreement when the payments were due. As a result, the 1980 Loan Agreement was amended by letter agreements dated February 9, 1984 (the "First Letter Agreement") and June 17, 1985 (the "Second Letter Agreement"). Nicaragua did not pay all of the amounts it owed under the 1980 Loan Agreement, the First Letter Agreement, and the Second Letter Agreement when they were due.

After Nicaragua defaulted on the payments due under the 1980 Loan Agreement and the letter agreements, LNC purchased on the secondary market at steep discounts notes issued by Nicaragua pursuant to the 1980 Loan Agreement. On October 3, 1986, LNC purchased by assignment from Drexel Burnham Lambert, Inc. $18,469,259.21 of the Category I Debt for $896,040.90. The assignment also included all interest accrued and to accrue on the debt assigned. On August 7, 1987, LNC purchased by assignment from National Westminster Bank USA (Nassau Branch) $7,783,028.19 of the Category I Debt for $253,332.70. See id. ¶ 40. LNC thereafter owned $26,252,287.40 of Category I Debt, excluding interest accrued after June 1986. See Joint 56.1 Stmt. ¶¶ 57–58.

On September 15, 1995, Nicaragua made an offer to purchase its Category I Debt at a price equal to 8% of the amount of the outstanding principal or 8 cents on the dollar. The Holders of 80% of the Category I Debt accepted Nicaragua's debt purchase offer. LNC rejected the debt purchase offer and remained a Record Owner in the amount of $26,252,287.40, excluding interest accrued after June 1986. Prior to bringing suit, LNC demanded payment from Nicaragua of the amount of Nicaragua's debt as to which LNC claims it is the Record Owner. Nicaragua declined to

---

1. Nicaragua waived sovereign immunity with respect to actions brought in connection with the 1980 Loan Agreement, pursuant to § 10.08(c) of the Agreement. See Joint 56.1 Stmt. ¶ 8.

pay. LNC filed suit on August 21, 1996, seeking to recover $26,252,287.40 plus accrued interest, attorneys' fees and reasonable costs, pursuant to the 1980 Loan Agreement, the First Letter Agreement and the Second Letter Agreement. The parties filed cross-motions for summary judgment on June 1, 1998. This Court entered an opinion on February 19, 1999, awarding LNC summary judgment and subsequently entered a final judgment on April 2, 1999, entitling LNC to recover $86,885,856.63 plus attorneys' fees and costs from the Republic of Nicaragua.

To satisfy the judgment it obtained, LNC has executed on certain assets of the Central Bank which are currently being held in the Federal Reserve Bank of New York by serving a Restraining Notice and Information Subpoena on the Federal Reserve Bank. The Central Bank is now moving to vacate and quash LNC's restraining notice, arguing that the Central Bank cannot be held liable for Nicaragua's default because the Central Bank is a corporate entity independent and distinct from the Republic of Nicaragua. LNC, however, contends that the motion must be denied because Nicaragua expressly waived any immunity of its Central Bank from post-judgment execution in respect of the obligations of Nicaragua in the 1980 Loan Agreement.

### Discussion

Under Fed.R.Civ.P. 69(a), the procedure for the execution of a judgment is governed by the practice and procedure of the state in which the district court resides. Section 5240 of the New York Civil Practice Law and Rules provides, in pertinent part: "The court may at any time, on its own initiative or the motion of any interested person, and upon such notice as it may require, make an order denying, limiting, conditioning, regulating, extending, or modifying the use of any enforcement procedure." N.Y. C.P.L.R. § 5240.

### A. Waiver of Immunity

As noted above, LNC argues that the motion to quash must be denied because Nicaragua expressly waived any immunity of its Central Bank from post-judgment execution in respect of the obligations of Nicaragua in the 1980 Loan Agreement. LNC relies on §§ 10.08(c) and 2.09(c) of the 1980 Loan Agreement in making this assertion. Section 10.08(c) provides, in relevant part:

> *Waiver of Immunities.* To the extent that the Republic or any Governmental Agency has or hereafter may acquire any immunity from jurisdiction of any court or from any legal process under any laws (other than immunity in the courts of the Republic from attachment prior to judgment, attachment in the courts of the Republic in aid of execution or execution in the courts of the Republic), whether through service or notice, attachment prior to judgment, attachment in aid of execution, execution or otherwise, with respect to itself or its property, the Republic hereby irrevocably waives such immunity in respect of the Republic's obligations under this Agreement and the Notes.

The second provision LNC relies upon, section 2.09(c), provides:

> *Authority to Charge Certain Accounts.* The Republic hereby authorizes each Bank, if and to the extent payment owed to such Bank is not made when due hereunder or under a Note, to charge from time to time any amount so due against any or all of the accounts with such Bank of the Republic, the Ministry of Finance of the Republic or the Central Bank of the Republic.

LNC argues that pursuant to these two contract terms, Nicaragua expressly waived any immunity that might otherwise attach to the property of its Governmental Agencies, including the Central Bank.[2]

---

2. The Loan Agreement provides that the term "Governmental Agency" means any ministry, department, authority or statutory corporation of, or any corporation or other entity owned or controlled by, the Republic, including the Central Bank. *See* 1980 Loan Agreement, § 1.01.

LNC further argues that section 1611(b) of the Foreign Sovereign Immunities Act of 1976 (FSIA), 28 U.S.C. §§ 1602–1611, expressly allows Nicaragua, as "parent government" to deliver the property of its Central Bank to satisfy judgements against itself. Section 1609 of the FSIA provides that the property of a foreign state enjoys a threshold immunity from attachment, arrest and execution "except as provided in sections 1610 and 1611 of this Chapter." Section 1611(b) specifically addresses the property of central banks, stating that:

> Notwithstanding the provisions of section 1610 of this chapter, the property of a foreign state shall be immune from attachment and from execution, if-
>
> (1) the property is that of a foreign central bank or monetary authority held for its own account, unless such bank or authority, or its parent foreign government, has explicitly waived its immunity from attachment in aid of execution, or from execution, notwithstanding any withdrawal of the waiver which the bank, authority or government may purport to effect except in accordance with the terms of the waiver. . . .

28 U.S.C. § 1611(b). Thus, LNC contends that Nicaragua made the Central Bank's property available to satisfy any judgments against it under the 1980 Loan Agreement and that the FSIA expressly permits a foreign government to abrogate the immunity of its agencies and instrumentalities.

The Central Bank, however, argues that the waiver of immunities clause in the 1980 Loan Agreement solely affects the jurisdictional powers of this Court and has absolutely no effect on the substantive issue of whether the Central Bank is responsible for the judgment LNC obtained against the Republic of Nicaragua.. The Court agrees based on the plain language of § 10.08(c) set out above. The Central Bank additionally argues that LNC's reliance on the FSIA is misplaced because, as stated by the Supreme Court in *First National City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611, 103 S.Ct. 2591, 77 L.Ed.2d 46 (1983) (hereinafter *Bancec* ), the FSIA is a jurisdictional statute that has no impact on substantive issues regarding the legal liability of a foreign state or instrumentality.

The FSIA is the exclusive basis for subject matter jurisdiction in any civil action initiated in a state or federal court against a foreign state, the instrumentality of a foreign state, or the property of a foreign state or instrumentality of a foreign state. *Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480, 493, 103 S.Ct. 1962, 76 L.Ed.2d 81 (1983); *Hercaire Int'l, Inc. v. Argentina*, 821 F.2d 559, 563 (11th Cir.1987). Jurisdiction under the FSIA is narrow and must be grounded in one of the specific exceptions to immunity specified in the FSIA itself or there must be an explicit waiver of immunity by the foreign state or the foreign instrumentality. *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434–35, 109 S.Ct. 683, 102 L.Ed.2d 818 (1989). In *Bancec*, the U.S. Supreme Court concluded that "[t]he language and history of the FSIA clearly establish that the Act was not intended to affect the substantive law determining the liability of a foreign state or instrumentality, or the attribution of liability among instrumentalities of a foreign state." *See Banco*, 462 U.S. at 620–21, 103 S.Ct. at 2597.

The Central Bank further argues that the language of § 1611 does not suggest that a waiver of a central bank's immunity is different from other waivers of immunity under the FSIA. As noted above, § 1611 provides that the property of a foreign central bank shall be immune from execution "unless such bank . . . or its parent foreign government has explicitly waived its immunity from attachment in aid of execution." 28 U.S.C. § 1611(b). The Central Bank argues that

> [a]lthough a parent government may waive the immunity of its central bank pursuant to § 1611, nothing in the clear language of § 1611 remotely suggests that such a waiver automatically renders

a central bank liable for a judgment entered against its parent government. Section 1611 simply demonstrates that the assets of a foreign bank can be attached and executed to satisfy a judgment entered *against that foreign central bank* when, and only when, the central bank or its parent government has made an explicit waiver of the bank's immunity.

*See* Reply Mem. Of The Central Bank, at 6. Thus, the Central Bank maintains that § 1611 does not support LNC's position that the Central Bank is automatically liable for the judgment entered against the Republic of Nicaragua as a result of the waiver of immunities clause in the 1980 Loan Agreement. The Court agrees.

Because the Court concludes that the waiver of immunities clause in the 1980 Loan Agreement pertains only to jurisdiction, the Court must next consider whether the Central Bank is an independent corporate entity and, if so, whether the Central Bank can be held liable for Nicaragua's default.

**Presumption of Separateness**

■ The Central Bank contends that under *Bancec* it cannot be held liable for Nicaragua's default because the Central Bank is an independent corporate entity. In *Bancec,* the Supreme Court found that "government instrumentalities established as juridical entities distinct and independent from the sovereign should normally be treated as such" and that such instrumentalities "are to be accorded a presumption of independent status." 462 U.S. at 626–27, 103 S.Ct. at 2600. The Supreme Court went on to find that this presumption of separateness is overcome and a governmental instrumentality is liable for the actions of its government when a judgment creditor can prove that: (1) the government entity is so extensively controlled by its owner that a relationship of principal and agent is created; or (2) recognizing a distinction between the government instrumentality and its government will work a fraud or injustice against the plaintiff. *See id.* at 629, 103 S.Ct. at 2601; *see*

*also Letelier v. Republic of Chile,* 748 F.2d 790, 794 (2d Cir.1984). LNC bears the burden of proving the agency relationship or the resulting fraud if the Central Bank is recognized as an independent corporate entity.

**1. Whether the Central Bank is the Alter-ego or Agent of the Republic of Nicaragua**

■ A government instrumentality loses its separate juridical status and becomes the alter-ego or agent of its parent government when the government exercises extensive control over the instrumentality's daily operations and abuses the corporate form. *Banco,* 462 U.S. at 629, 103 S.Ct. 2591; *Alejandre v. Telefonica Larga Distancia de Puerto Rico, Inc.,* 183 F.3d 1277, 1284 (11th Cir.1999); *Hester Int'l Corp. v. Federal Republic of Nigeria,* 879 F.2d 170, 178–81 (5th Cir.1989). In *Bancec,* the Supreme Court outlined the features it attributed to the typical independent government instrumentality:

> A typical government instrumentality, if one can be said to exist, is created by an enabling statute that prescribes the powers and duties of the instrumentality, and specifies that it is to be managed by a board selected by the government in a manner consistent with the enabling law. The instrumentality is typically established as a separate juridical entity, with the powers to hold and sell property and to sue and be sued. Except for appropriations to provide capital or to cover losses, the instrumentality is primarily responsible for its own finances. The instrumentality is run as a distinct economic enterprise; often it is not subject to the same budgetary and personnel requirements with which government agencies must comply.

462 U.S. at 624, 103 S.Ct. at 2599. The Supreme Court explained that

> [t]hese distinctive features permit government instrumentalities to manage their operations on an enterprise basis while granting them a greater degree of

flexibility and independence from close political control than is generally enjoyed by government agencies. These same features frequently prompt governments in developing countries to establish separate juridical entities as the vehicles through which to obtain the financial resources needed to make large-scale national investments.

*See id.* at 624–25, 103 S.Ct. at 2599.

The Central Bank argues that under the Supreme Court's definition of "a typical government instrumentality," the Central Bank enjoys the status of a separate and independent legal entity. The Central Bank is a government corporation incorporated under the laws of the Republic of Nicaragua and wholly owned by the Republic of Nicaragua. The Central Bank engages in both governmental and private banking activities. *See* Decl. of Dr. Jose Marquez Ceas, Director of International Operations of the Central Bank ("Ceas Decl.") ¶¶ 1, 5. The Central Bank was created by an enabling statute, Ley Organica del Banco Central de Nicaragua. The Central Bank is operated as a distinct banking enterprise with the Republic of Nicaragua assuming a general supervisory role over the Central Bank's operations. The Republic of Nicaragua does not have control over the day to day operations of the Central Bank or the monetary policies it adopts. The Central Bank is responsible for its own financing and maintains its own operating facilities. *See id.* ¶ 6. The Central Bank is managed by a board of directors and corporate officers who are appointed by the Republic of Nicaragua with each director and officer serving a five year term. The directors and officers come from the private and public sector and establish Nicaragua's monetary policy without government supervision or control. *See id.* ¶ 7. The officers and directors are employees of the Central Bank and are not civil employees of Nicaragua. The officers and directors can be removed from office by the Republic for extraordinary circumstances such as mental or physical disability for more than three months, obvious professional incompetence, and continued lack of attendance at the Board of Directors' meetings. *See id.*

The enabling statute requires the Central Bank to formulate and administer Nicaragua's monetary policies. *See id.* ¶ 4. In order to formulate and administer Nicaragua's monetary policies, the Central Bank has been given the authority to print and issue currency, establish interest rates, purchase and sell financial instruments, and monitor Nicaragua's external debt. *See id.*

In addition to performing governmental functions, the Central Bank has the legal authority to operate like any private corporation. For instance, the Central Bank can own and sell property in its own name, establish and maintain bank accounts in its own name, and sue and be sued in a court of law in its own name. *See id.* ¶ 5. These powers are not controlled by the Republic of Nicaragua and or its ministries, but by the enabling statute, principles of Nicaraguan corporate law, and the officers and directors of the Central Bank. *See id.* The Central Bank provides private banking services to private and public corporations, including private Nicaraguan banks and private individuals. *See* Ceas Decl. in Furth. Supp. ¶ 4. The Central Bank regularly facilitates monetary transfers and business transactions between Nicaraguan entities and entities abroad by opening its accounts at the Federal Reserve Bank of New York to Nicaraguan and foreign entities who then utilize the Central Banks's accounts to make and receive payments to and from one another. The Central Bank also acts as a servicing agent to facilitate loans made by international creditors to Nicaraguan entities. *See id.* The Central Bank additionally acts as a banker for commercial banks and other financial institutions pursuant to regulations adopted by the Central Bank's Board of Directors. For example, the Central Bank opens accounts for local and foreign commercial banks and financial institutions, accepts deposits from these banks and institutions, and provides services related to the clear-

ing and processing of checks and securities. Deposits made by commercial banks and financial institutions into the Central Bank's accounts are the funds that the Central Bank uses to account for and process the credits and debits that result from the Clearing House's check clearing system. *See id.* ¶ 5.

The assets that are currently restrained by LNC's Notice of Restraint were deposited by a number of private banks into the Central Bank's account at the Federal Reserve Bank of New York to facilitate several international monetary transactions. Thus, according to the Central Bank, the restrained assets are currently being held by the Central Bank pursuant to the banking services for private banks and other private entities and are not the assets of the Republic of Nicaragua or the Central Bank. *See id.* ¶ 6.

LNC does not dispute that the Central Bank performs the above functions, but argues that the Central Bank's most important functions are those of an arm of the state and that the Court need not resolve the issue of day to day control of the Central Bank.

■ The Court concludes that LNC has not shown that Nicaragua exercises such extensive control over the Central Bank that the Court should find that the Central Bank is the agent of Nicaragua. Circuit courts that have applied the factors outlined in *Bancec* have similarly found that wholly owned government instrumentalities like the Central Bank are not the agents of their respective governments. *See, e.g., Hester,* 879 F.2d at 181; *Hercaire Int'l, Inc. v. Argentina,* 821 F.2d 559, 565 (11th Cir.1987); *Letelier,* 748 F.2d at 795.

In *Letelier,* the plaintiffs attempted to execute on the assets of Chile's wholly owned national airline, Linea Aerea Nacional–Chile (LAN), to satisfy a default judgment obtained against Chile. The Second Circuit found that the plaintiffs failed to overcome the presumption of separateness established by *Bancec* even though Chile utilized LAN's facilities to commit the tortious acts that led to the adverse judgment and controlled LAN's assets and facilities in the relevant time period. *See Letelier,* 748 F.2d at 794. The Second Circuit concluded that "[t]he evidence submitted by the judgment creditors does not reveal abuse of corporate form of the nature or degree that *Bancec* found sufficient to overcome the presumption of separate existence" and noted that "*Bancec* and the FSIA legislative history caution against too easily overcoming the presumption of separateness." *See id.* at 795.

In *Hercaire,* the Plaintiff similarly attempted to execute on the property of a wholly owned national airline, Argentina's Aerolineas Argentinas, in satisfaction of a judgment against Argentina in a breach of contract action. The court found that plaintiff failed to show that Argentina exercised such extensive control over Aerolinas as to warrant a finding of principal and agent and that Argentina's 100% ownership of Aerolineas' stock was insufficient to overcome the presumption of separate juridical existence. *See Hercaire,* 821 F.2d at 561.

In *Hester,* plaintiff, a Mississippi corporation, brought a breach of contract action against the Federal Republic of Nigeria (Nigeria) and a Nigerian corporation, the National Grains Production Company, Ltd., (NGPC), among other defendants, stemming from an agreement to establish a rice farming operation in Nigeria. Because Nigeria was not a party to the contract, the plaintiff had to prove that NGPC was the agent or alter-ego of Nigeria in order to bind Nigeria to the contract and pursue its breach of contract claim against Nigeria. *Hester,* 879 F.2d at 176. The *Hester* court concluded that the plaintiff failed to show that an agency relationship existed. The court found that the plaintiff may have established that Nigeria had a general supervisory role over the NGPC but did not prove that Nigeria was involved in the day-to-day management of the NGPC. The court further held that Nigeria's 100% ownership of NGPC's stock and the fact that Nigeria appointed NGPC's Board of Directors were insuffi-

cient to overcome the presumption of separateness. *See id.* at 181. The *Hester* court additionally noted that the NGPC possessed most of the characteristics described in *Bancec* as the "typical government instrumentality." *See id.*

This Court similarly finds that the Central Bank possesses most of the characteristics of a typical government instrumentality listed in *Bancec* and concludes that LNC has not shown that the Central Bank was the agent or alter-ego of Nicaragua.

### 2. Fraud or Injustice

■ The presumption of separateness may also be overcome and a government instrumentality held liable for the actions of its government if recognizing the legal distinction between the instrumentality and its government will work a fraud or injustice. *See Banco,* 462 U.S. at 629, 103 S.Ct. 2591. In *Bancec,* the Cuban bank of the same name brought suit against Citibank to collect on a letter of credit issued in its favor in 1960. Citibank counterclaimed, arguing that it was entitled to set-off amounts as compensation for the Cuban government's expropriation of Citibank's assets in Cuba. The Supreme Court concluded that Bancec's claim could be set-off because Bancec was nationalized during the Cuban revolution and the true beneficiary of Bancec's claim was therefore the Cuban government. 462 U.S. at 631–32, 103 S.Ct. at 2602. The *Bancec* Court found that recognizing the separate juridical status of Bancec would work a fraud or injustice by allowing the Cuban government to obtain relief in American courts while simultaneously protecting itself from liability. The Court noted that "[h]aving dissolved Bancec and transferred its assets to entities that may be held liable on Citibank's counterclaim, Cuba cannot escape liability for acts in violation of international law simply by retransferring the assets to separate juridical entities." *See id.* at 633, 103 S.Ct. at 2603. The Central Bank

maintains that recognizing its separate juridical existence will not work a fraud or injustice because Nicaragua has not utilized the Central Bank's corporate identity to perpetrate a fraud or shield itself from liability. Nor has Nicaragua utilized the Central Bank to obtain relief in American courts while simultaneously shielding itself from liability, as was the case in *Bancec.*

■ LNC argues that vacating the subpoena would work a fraud or injustice because only the Republic of Nicaragua will benefit if the restraint is vacated. In making this argument, however, LNC relies on statements attributed to the General Manager of the Central Bank that appeared in a Nicaraguan newspaper. The Court finds that this evidence is inadmissible hearsay and will not consider it on this motion.[3]

The Court recognizes that vacating the subpoena in this case will make LNC's task more difficult but nonetheless concludes that there is no indication that any "fraud or injustice" will result from insulating the Central Bank's property from attachment in aid of execution of the judgment against Nicaragua.

LNC has requested that, should the Court grant the Central Bank's motion, the Order contain a delay of effectiveness for a period of ten business days to allow LNC to move for a stay pending appeal. LNC's request is granted.

### Conclusion

For the reasons discussed above, the Central Bank's motion to vacate and quash the Restraining Notice and Information Subpoena served upon the Federal Reserve Bank is granted.

**SO ORDERED.**

---

**3.** Although LNC urges the Court to admit the statements under the catchall provision of F.R.E. 803(24), the Court notes that this provision no longer exists under the Federal Rules of Evidence, having been replaced by Rule 807. The Court will not admit the statements under Rule 807.